IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TRACEY SCHMIDT,

        Plaintiff,

vs.                                       No.  03cv0786 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Schmidt's) Motion to Reverse or Remand the Administrative Decision **[Doc. No. 8]**, filed November 20, 2003, and fully briefed on February 6, 2004.  On February 27, 2003, the Commissioner of Social Security issued a final decision denying Schmidt's application for supplemental security income benefits.   Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is well taken and will be GRANTED.

### I.  Factual and Procedural Background

Schmidt, now thirty-seven years old, filed his application for supplemental security income on September 14, 2001, alleging disability since October 1, 1996, due to bipolar disorder, post-traumatic stress disorder, irritable bowel syndrome, and asthma.  Tr. 17.  Schmidt has a tenth grade education and past relevant work as a care provider, school bus driver, and custodian.  Tr. 19.  On February 27, 2003, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Schmidt's impairments of bipolar disorder, post-traumatic stress disorder, irritable

bowel syndrome, and asthma were severe impairments "within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Tr. 17. The ALJ further found Schmidt retained the residual functional capacity (RFC) to perform a medium range of work with mild mental limitations, and frequent, varying unscheduled bathroom breaks. Tr. 19. As to his credibility, the ALJ found Schmidt's testimony was "not fully credible as it [was] not consistent with the bulk of the evidence of record." Tr. 18. Schmidt filed a Request for Review of the decision by the Appeals Council. On June 23, 2003, the Appeals Council denied Schmidt's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Schmidt seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from

the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington*

*v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a

claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in

substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing

42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the

Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the

Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is

not engaged in substantial gainful employment, he has an impairment or combination of

impairments severe enough to limit his ability to do basic work activities, and his impairment

meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience. *Id.*

       In support of his motion to reverse, Schmidt makes the following arguments: (1)  the ALJ

erred in her analysis under the Listing of Impairments; (2) the ALJ erred in her analysis of

credibility; and (3) the ALJ erred in her assessment of residual functional capacity.  The Court will

first address Schmidt's second argument.

## A.  Credibility Determination

       Credibility determinations are peculiarly the province of the finder of fact and will not be

upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*,

898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively

linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v.

Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination

does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206

F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence she relies on

in evaluating claimant's credibility.  *Id.*  The ALJ may also consider her personal observations of

the claimant in her overall evaluation of the claimant's credibility.  *Id.*

       Schmidt contends the ALJ erred in her assessment of his credibility because (1) she failed

to cite the evidence she claimed was inconsistent; and (2) the ALJ misstated the availability of

medical treatment available to him.  In her decision the ALJ noted that, although Schmidt

indicated he had undergone tests for gastrointestinal disorder, "this impairment did not

significantly affect him" because he "last received treatment one year ago."  Tr. 18.  The ALJ

found Schmidt's explanation that "he did not receive follow-up because he resided outside of a county that could provide medical care" not credible.  *Id.*  The ALJ noted the record indicated "that a treating source at the medical facility reported that some arrangement could be made for a non-county resident."  *Id.*

The record indicates that on May 2, 2002, Rick Lawyer, LMSW, Schmidt's therapist, noted Schmidt had ongoing symptoms due to his Crohn's disease.  Tr. 267.  Mr. Lawyer indicated Schmidt had been unable to leave his home "many days of the week" due to his symptoms.  Mr. Lawyer also noted he had given Schmidt information on indigent programs in the area for health care needs.

On June 6, 2002, Mr. Lawyer again noted Schmidt had "been very ill with symptoms of Crohns disease– feeling extremely nauseous, aches/chills, and being chronically tired."  Tr. 265.  Mr. Lawyer noted Schmidt "talked about not having the money to get his prescriptions, and not being able to see a doctor."  *Id.*  Schmidt told Mr. Lawyer he had gone to First Choice Clinic in Los Lunas and had been charged $52.00 even though he had explained that he had no money.  Mr. Lawyer noted he again discussed indigent programs Schmidt might contact.  Tr. 265.  Schmidt reported "they could not help him, as he ha[d] already tried to access services."  *Id.*  Mr. Lawyer then noted, "Made phone calls relating to client's medical and financial needs.  Left messages for Glenna Giles (re: medications for bipolar/depression) and with case manager Angela Garza (re: Tracy's medical and medication needs).  Called various agencies regarding assistance, none appear to have funds at this time."  Tr. 266.  It appears that even Schmidt's therapist had problems finding medical assistance for Schmidt.

5

Schmidt contends his "primary problem is caused by his gastrointestinal disorder causing diarrhea and need for frequent and unpredictable restroom breaks throughout the course of a day." Pl.'s Mem. in Supp. of Mot. to Reverse at 14.  The record indicates that on November 23, 2001, Schmidt presented at University Hospital emergency room with complaints "of several days worth of nausea, vomiting, severe left lower quadrant abdominal pain and bloody diarrhea." Tr. 218.  Schmidt reported a history of four years of Crohn's disease.  *Id.*  Dr. Comerci's  discharge notes indicate that a colonscopy showed that "in fact there was not any Crohn's disease visible in the colon, however, there were multiple diverticula." Tr. 218.  Dr. Comerci treated Schmidt accordingly and reported improvement.  Dr. Comerci noted Schmidt tolerated regular food on the night of the 26th and the morning of the 27th, although "he continued to complain of nausea and abdominal pain" which was controlled with antiemetics and Donnatal.  Dr. Comerci opined that the negative colonoscopy "cast some doubt whether this patient actually has Crohn's disease." *Id.*  Dr. Comerci also noted there was no occult or gross blood in Schmidt's stool and his hematocrit was normal.  Dr. Comerci noted:

> OVERALL ASSESSMENT:  This patient has some sort of inflammatory processing in his descending bowel, perhaps **mild diverticulitis** vs other colonitis.  He seems to have **done well on PO antibiotics and several days of bowel rest** and our plan is to have him follow-up with both the Medicine Follow-up Clinic and the GI (gastrointestinal) Service.
>
> DISPOSITION AND RECOMMENDATION:  Discharge Instructions–
> 1.  The patient is to return to the Medicine Follow-up Clinic on December 12, 2001, at 2:20 PM.  The patient was instructed to go to the 5th floor of the hospital for this appointment. Issues to review at that time are basically whether the patient's vomiting has been under control.  We are mainly making sure that the patient is stable until further GI work-up can resume.  **It is not our assessment during this admission that the patient should have any difficulty eating a regular diet and maintaining good hydration**.

Tr. 219 (emphasis added).  Unfortunately, Schmidt received a bill from University Hospital in

excess of $8,000 (Tr. 455-457) and did not return as directed.[1]  Additionally, a UNM Health

Sciences Center Financial Assistance Gross Income Chart, signed by the hospital's chief financial

officer and dated April 2003, indicates "no funds available" for individuals residing in Catron,

Harding, and Sandoval counties.  Tr. 451.  According to the brief filed by Schmidt's counsel, this

indicates the three counties whose residents are eligible for services at University Hospital

because these counties do not have indigent care funding.  Tr. 443.  Schmidt resides in Valencia

county.  Thus, Schmidt was not eligible for indigent services at University Hospital.

   The Court has reviewed the record and finds that, although Schmidt's irritable bowel

syndrome may be controlled with treatment, it poses a significant problem when medical care is

not available to him.  Evidence that Schmidt sought medical treatment for what he claims is a

disabling impairment and was refused treatment for an inability to pay is evidence that the ALJ

should consider in determining disability.  *See, eg.*, *Allen v. Apfel*, No. 99-3249, 2000 WL

796081, at **3 (10th Cir. 2000)(unpublished opinion)(citing *Murphy v. Sullivan*, 953 F.2d 383,

386 (8th Cir. 1992)("Clearly, if the claimant is unable to follow a prescribed regimen of

medication and therapy to combat her disabilities because of financial hardship, that hardship may

be taken into consideration when determining whether to award benefits.").  Because the ALJ did

---

[1]  Schmidt submitted (1) his overdue medical bill statements from University Hospital (Tr. 454-457) and (2) UNM Health Sciences Center Financial Assistance Gross Income Chart dated April, 2003 (Tr. 451), to the Appeals Council.  Although this evidence was not before the ALJ, because it was before the Appeals Council, the Court must consider it when evaluating the Commissioner's decision for substantial evidence.  *See, O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).

not have the materials submitted to the Appeals Council before her, the Court will remand the case for her consideration of this evidence.

However, the Court does not require any result.  The issue of whether Schmidt's irritable bowel syndrome is disabling is for the ALJ to determine.  Moreover, if indigent medical care is available and Schmidt does not avail himself of treatment for his irritable bowel syndrome, the ALJ may deny benefits for failure to follow a prescribed course of treatment.  *See* 20 C.F.R. 404.1530(b); *see also, Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987)(discussing requisite findings to deny benefits based on claimant's failure to follow prescribed course of treatment).

**B.   ALJ's Analysis Under the Listing of Impairments**

Schmidt also argues he meets Listing 5.06– Chronic ulcerative or granulomatous colitis, specifically, sections A and E.  The Court disagrees.  Even if Schmidt had the required diagnosis, he failed to meet either sections A or E.  Section A requires a showing of "Recurrent bloody stools documented on repeated examinations **and** anemia manifested by hematocrit of 30 percent or less on repeated examinations."  *See* Pt. 404, Subpt. P, App. 1, Listing 5.06A.  The last hematocrit available was done at University Hospital on November 23, 2001, and that was normal.  Section E requires a showing of "Weight loss as described under § 508."  *See id.*, Listing 5.06E.  Listing 508, Table 1– Men,  indicates Schmidt would have to weight 106 pounds to qualify.  Schmidt is five feet seven inches (Tr. 344) and his weight has fluctuated from 150 pounds (Tr. 365) to 127 pounds (Tr.346).  Moreover, on May 8, 2002, Kathy Karkick, Schmidt's friend of five years, submitted a Third Party Daily Activities Questionnaire and indicated Schmidt "was obsessed with weight & appearance" and "at times will go for days without eating 'to lose weight.'"  Tr. 133.  Thus, Schmidt does not meet Listing 5.06A or E.

Schmidt also contends he meets Listing 12.04– Affective Disorders and Listing 12.06– Anxiety Related Disorders.  Schmidt relies on Dr. Baca's September 24, 2001 Physician Questionnaire.  Tr. 213-216.  Dr. Baca noted in the Questionnaire that he had seen Schmidt for a total of four visits.  Tr. 213.  However, as the Commissioner points out, there is only one recorded visit with Dr. Baca that took place on September 24, 2001.  On that day, Dr. Baca evaluated Schmidt and submitted a Psychiatric Evaluation/Comprehensive Assessment.  Tr. 208-216.  Dr. Baca also completed a Mental Residual Capacity Assessment form (Tr. 210) and Progress Notes (Tr. 212).  The Commissioner contends Dr. Baca is not considered a treating physician based on one visit.  In *Doyle v. Barnhart*, 331 F.3d 758 (10th Cir. 2003) the Tenth Circuit addressed a similar issue and found:

> The treating physician's opinion is given particular weight because of his unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalization.  20 C.F.R. § 416.927(d)(2).  This requires a relationship of both duration and frequency.  The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.  As the Supreme Court recently observed, the assumption that the opinions of a treating physician warrant greater credit that (sic) the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration.  Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.

*Id.* at 762-63 (internal citations and quotations omitted).  The Social Security Administration regulations direct the decisionmaker to look at the "[l]ength of the treatment relationship and the frequency of examination," and the "[n]ature and extent of the treatment relationship," in determining whether a physician's opinion is entitled to controlling weight,   *See* 20 C.F.R. § 416.927(d)(2)(i),(ii).

In this case, the ALJ noted , "although the treating physician at Valencia Counseling provided a residual functional capacity assessing marked functional limitations in the areas of daily living and concentration, I find this opinion is inconsistent with the evidence."  Tr. 17.  Based on this finding, the ALJ disregarded Dr. Baca's opinion and adopted Dr. Rene Gonzales' opinion and the State medical reviewers' opinions.  Significantly, Dr. Gonzales, the agency consultant and psychiatrist, noted in his report:

> He mentioned that he is presently seeing a nurse practitioner of Valencia Counseling who has been prescribing Neurontin 800 mg at bedtime, Depakote ER 100 mg at bedtime, Zyprexa 15 mg at bedtime and Serzone 400 mg at bedtime.  The claimant mentioned that he doesn't see the psychiatrist at all.  He also sees a psychologist every two weeks.  He has been seeing him for about 7-8 months.

Tr. 245 (emphasis added).  Because Schmidt reported he did not see the psychiatrist at all, Dr. Gonzales recommended Schmidt see the psychiatrist, along with the nurse practitioner, for medication management.  Tr. 246.  The record indicates Glenna Giles, a nurse practitioner at Valencia Counseling Services, Inc., prescribed and managed Schmidt's psychotropic medications.  See e.g., Tr. 270, 276.  The record also indicates Rick Lawyer, the psychiatric social workers at Valencia Counseling Center, was responsible for providing therapy to Schmidt.  See, e.g., Tr. 263, 265, 267, 268, 269.  There are no clinical notes from Dr. Baca indicating he provided therapy to Schmidt.

The record indicates Schmidt's first visit (Tr. 314– Intake) to Valencia Counseling Services, Inc., was on May 22, 2001.  Tr. 314-324.  On that day, Maria Sanchez was assigned as Schmidt's primary therapist.  Tr. 313.  Ms. Sanchez evaluated Schmidt and completed "The Initial Assessment" form.  Tr. 315-324.  Schmidt reported he was experiencing increased anxiety, increased depression, and mania.  Tr. 315.  Schmidt also reported he had been under psychiatric

treatment in Oregon.  *Id.*  Notably, Schmidt reported he had been compliant with his psychiatric treatment and reported <u>his response to the treatment had been good</u>.  Tr. 317.  Schmidt also reported losing weight over a four month period and stated he weighed 128 pounds on that day.  Tr. 316.  Ms. Sanchez opined Schmidt needed medication management.  Ms. Sanchez assigned Schmidt a GAF score of 30.[2]  A GAF score of 30 indicates, "Behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas."  DSM-IV-TR at 34.

On May 23, 2001, Glenna Giles saw Schmidt for medication management.  Tr. 310-312.  Schmidt reported he had "lost 30 pounds in the last year."  Tr. 311.  Ms. Giles noted Schmidt had been out of his medications for six months due to financial difficulties.  Ms. Giles assessed Schmidt with Bipolar Disorder, hypomanic/mixed and assigned him a GAF score of 45.  A GAF score of 45 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR at 34.  Ms. Giles prescribed Zyprexa, Serzone, and Neurontin.  Ms. Giles directed Schmidt to return in two weeks.  Tr. 310.

On May 23, 2001, Ms. Sanchez referred Schmidt to Rick Lawyer.  Tr. 309.  Mr. Lawyer telephoned Schmidt on that day but could not reach him and left a message.  Tr. 308.  On May 31, 2001, Mr. Lawyer called Schmidt.  Tr. 307.  Schmidt reported he had no insurance, no income and "a lot of health problems."  *Id.*  Schmidt also informed Mr. Lawyer that he had just

---

[2] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."   American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.

been denied "SSI in Oregon." *Id.*  Schmidt requested Mr. Lawyer go to his home because he was too confused and did not know the area to come to the clinic.  Mr. Lawyer arranged to make a home visit the following day.

On June 1, 2001, Mr. Lawyer drove to Schmidt's home.  Tr. 306.  Schmidt informed Mr. Lawyer he had been in the area since February 2001, and had many needs.  Schmidt told Mr. Lawyer he was on eight or nine medications and could not get some of them refilled because he had no income.  Schmidt also reported having applied for and denied SSI three times in Oregon. The goals set by Schmidt and Mr. Lawyer were (1) apply for General Assistance; (2) reapply for SSI disability; (3) get his medications, housing and/or finances to pay his roommate rent; and (4) get normal again.  On June 6, 2001, Mr. Lawyer met with Ms. Sanchez to discuss Schmidt's case. Ms. Sanchez noted Mr. Lawyer would get Schmidt financial aid.

On June 11, 2001, Ms. Giles saw Schmidt for medication management review.  Tr. 304. Ms. Giles gave Schmidt some samples of Zyprexa and Serzone.  Ms. Giles directed Schmidt to continue taking Neurontin and return in eight weeks.  On the same day, Schmidt dropped in to see Mr. Lawyer.  Tr. 303.  Schmidt reported he had received food stamps and had an appointment to apply for General Assistance.

On June 14, Mr. Lawyer noted he had received documentation from Schmidt's lawyer regarding his previously denied Social Security applications.  Tr. 301.  Mr. Lawyer noted Schmidt had an appointment with HSD for June 20, 2001.  Schmidt informed Mr. Lawyer he was unable to get his Neurontin.  On the same day, Mr. Lawyer met with Ms. Giles regarding Schmidt's inability to get the Neurontin.  Tr. 300.  Ms. Giles indicated she had written a prescription for

Neurontin on May 23, 2001, with five refills.  Mr. Lawyer noted he would get the prescription

paid by CAP office.

On June 15, 2001, in preparation for the HSD appointment, Mr. Lawyer met with Schmidt

to review the documentation Schmidt's attorney had provided.  Tr. 299.  Mr. Lawyer noted,

"Spent most of meeting organizing documents, chronologically arranging, and assembling with

fasteners in a file folder, thus preparing client for an upcoming meeting at HSD-ISD."  Tr.299.

Mr. Lawyer made arrangements to meet Schmidt to attend the HSD meeting.

On June 18, 2001, Mr. Lawyer noted Schmidt was unable to reach his HSD caseworker

and also needed medication.  Mr. Lawyer noted he would arrange for the CAP office to pay for

the medication.

On June 20, 2001, Mr. Lawyer noted he discussed Schmidt's case with Luanne, an

individual at DVR in Belen.  Tr. 297.  Luanne requested a psychiatric evaluation to facilitate the

process of a job-site assessment.  Mr. Lawyer called and left a message with Schmidt's girlfriend.

Mr. Lawyer noted, "Working with DVR and La Vida Felicidad regarding services for this client."

*Id.*

On June 20, 2001, Ms. Sanchez noted, "Clt is under a lot of stress due to his roommate

not wanting him there.  Tracy has know (sic) place to move."  Tr. 296.  Ms. Sanchez also noted

Schmidt appeared anxious and stressed.  Schmidt was to speak with Mr. Lawyer about Section 8

housing.

On June 28, 2001, Mr. Lawyer attended the HSD meeting with Schmidt.  Tr. 205.  Mr.

Lawyer assisted Schmidt in completing forms and in answering questions.

On July 5, 2001, Ms. Sanchez provided therapy to Schmidt and reported he was happy that Mr. Lawyer was helping him get assistance. Tr. 294. Schmidt reported he had been ill with Crohn's disease. Ms. Sanchez assessed Schmidt as "Clt was normal." *Id.*

On July 10, 2001, Ms. Giles noted Schmidt had gained weight and appeared healthier. Tr. 293. Schmidt reported the medication had decreased his paranoid thoughts and stopped the voices. Ms. Giles noted Schmidt had not received the Neurontin, was doing better but still "very somatic." *Id.* Ms. Giles prescribed Neurontin, Zyprexa, and Serzone. Ms. Giles directed Schmidt to return in four weeks.

On July 19, 2001, Schmidt returned for a therapy session with Ms. Sanchez. Tr. 292. Ms. Sanchez noted Schmidt was depressed and having problems with his roommate. Schmidt also reported he was having problems sleeping. Ms. Sanchez noted she would speak with the case manager, Mr. Lawyer, regarding Schmidt's SSI application.

On August 2, 2001, Schmidt returned for his therapy session with Ms. Sanchez. Tr. 291. Schmidt reported he was still having problems sleeping and also complained of stomach pain. Ms. Sanchez assessed Schmidt as "stressed" and advised him to set up an appointment with UNM Hospital for the stomach pain.

On August 7, 2001, Ms. Giles reported Schmidt was having less leg pain since starting the Neurontin. Tr. 290. Notably, Schmidt reported "all his medications are helping him." *Id.* Ms. Giles noted Schmidt had gained weight. Schmidt reported he had applied for disability and heard voices. Ms. Giles noted, "Doing better. I'm not sure what to believe [about] the voices, not that I don't believe he is disabled. <u>There is no evidence of psychoses at this time. He is well</u>

14

controlled with Zyprexa." *Id.* Ms. Giles directed Schmidt to continue on his medications and return in eight weeks.

On September 4, 2001, Schmidt returned for his therapy session with Ms. Sanchez. Tr. 289. Ms. Sanchez noted Schmidt had been ill with his Crohn's disease. Schmidt reported his cousin had allowed him to stay in his home since Schmidt was getting food stamps. Schmidt requested he be transferred to Mr. Lawyer in Belen. Ms. Sanchez noted, "Clt was in a good mood." *Id.* Ms. Sanchez directed Schmidt to schedule an appointment with Mr. Lawyer as his primary therapist.

On October 2, 2001, Ms. Giles noted Schmidt had been in and claimed he only had about 3-4 days worth of medication. Tr. 286. Ms. Giles noted she would order more medication from the drug company and directed Schmidt to return on Friday.

On October 17, 2001, Mr. Lawyer returned Schmidt's telephone call. Tr. 284. Schmidt reported being out of medications. Schmidt reported he had gone to First Choice and they had referred him to UNM Indigent Program for consultation. Mr. Lawyer provided Schmidt the information on the Valencia County Indigent Funds Program for assistance with hospital bills and advised him to contact them prior to making any arrangements at UNM. Mr. Lawyer provided information and several resources for Schmidt to contact and gave Schmidt information on UNM's Indigent Program.

On October 19, 2001, Ms. Giles noted Schmidt was in to pick up his medications. Tr. 283. Ms. Giles assessed Schmidt as "stable." On the same day, Schmidt called Mr. Lawyer. Schmidt reported he was happy to get his medications since he had been out of them for a while. Schmidt also informed Mr. Lawyer that the attorney representing him in his Social Security case

needed a letter from Dr. Baca.  Mr. Lawyer noted, "Meet with client on 10-22-01.  As needed."
*Id.*  Schmidt's lawyer also called on that day.

On October 22, 2001, Schmidt returned for his therapy session with Mr. Lawyer.  Tr. 280.
Schmidt <u>reported feeling and sleeping better since he started the Depakote the previous week</u>.
Schmidt told Mr. Lawyer he was concerned about hair loss and had done a search on the internet
and found Crohn's disease did not cause hair loss and was concerned it was a side effect of his
medications.  Schmidt also discussed having a telephone interview with someone from the Social
Security Administration.  Mr. Lawyer noted, "Meet with client in two weeks.  As needed."  *Id.*

On October 23, 2001, Mr. Lawyer met with the Treatment Team and discussed Schmidt's
case.  Tr. 279.  Mr. Lawyer noted he had gotten Schmidt's medications and would arrange to get
them to him.  On October 24, 2001, Mr. Lawyer had not been able to reach Schmidt to deliver the
medications.

On November 5, 2001, Schmidt returned to see Mr. Lawyer.  Tr. 277.  Schmidt discussed
his problems with Crohn's disease, reporting nausea and diarrhea.  Mr. Lawyer noted:

> Discussed his medications and how client is <u>changing dosage, and not following doctor's</u>
> <u>advice.</u>  Tracy stated if he takes two Depakote tablets, as prescribed, he feels extremely
> tired and has a difficult time staying awake during the daytime.  He stated he has an
> appointment with Glenna Giles, on 11-16-01.  He will discuss these issues with Glenna.
> Client stated he <u>rode his horse over the weekend</u>, which he said went well (the horse is only
> green-broke).  Client also had on new shoes/boots, which he said he had just purchased.
> Client stated he could not go to see his PCP at First Choice, as he did not have the $10-
> 20.00 co-pay they require.

Tr. 277 (emphasis added).  Mr. Lawyer assessed Schmidt as "appears to be doing well today.
Making poor choices with money, possibly <u>not being completely truthful</u> about situation.
Purchasing new boots, rather than going to his PCP (primary care provider) regarding his Crone's
(sic) disease."  *Id.*

16

On November 11, 2001, Ms. Giles noted Schmidt came to the walk-in clinic reporting he only had Zyprexa for five days.  Tr. 276.  Ms. Giles gave him more Zyprexa and directed him to return in six weeks.

On January 1, 2002, Mr. Lawyer met with Schmidt.  Tr. 274.  Schmidt reported he had gone to Oregon for the holidays.  Schmidt also informed Mr. Lawyer about his hospitalization at University Hospital due to his Crohn's disease.  Schmidt told Mr. Lawyer he had an appointment on January 30, 2002, with UNM Business Office to discuss his outstanding bill.  Schmidt reported he owed $17,000 in student loans and $6,000 in taxes.  Mr. Lawyer noted Schmidt "appeared to be continuing to experience health problems and had been sick a lot recently."  *Id.*

On January 9, 2002, Ms. Giles noted Schmidt was in the hospital for symptoms related to Crohn's disease.[3]  Tr. 326.  Schmidt reported he was out of medicine.  Ms. Giles noted Schmidt's mood and mental status were unchanged and he appeared stable.

On February 8, 2002, Mr. Lawyer met with Schmidt for his therapy session.  Tr. 273. Schmidt reported running out of his Zyprexa on February 4.  Mr. Lawyer called Ms. Giles and requested medication for Schmidt.  Ms. Giles said she would call as soon as she received her medication order for Zyprexa.  Schmidt then informed Mr. Lawyer that he still had some Zyprexa but it was a lower dosage.  Mr. Lawyer confronted Schmidt about reporting that he did not have any Zyprexa.  Schmidt responded that "he just didn't want to run out."  *Id.*  Schmidt reported he was worried about his SSI claim for disability.  Schmidt also told Mr. Lawyer, "he was keeping himself busy by caring for the animals, house, and other matters at home."  *Id.*  Schmidt reported

---

[3] Although Ms. Giles dated this visit as occurring on January 9, 2001, it is apparent that it occurred in 2002.  Schmidt's first visit to Valencia Counseling Services, Inc. was on May 22, 2001.

feeling frequently sick due to his Crohn's disease and often felt like not doing anything.  Schmidt reported he felt "content to live this way for now."  *Id.*

On February 26, 2002, Schmidt returned to see Mr. Lawyer.  Tr. 272.  Mr. Lawyer counseled Schmidt on relationship issues, setting boundaries and limits.  Mr. Lawyer noted Schmidt appeared "a bit distressed and quite tired."  *Id.*  Mr. Lawyer noted Schmidt "continued to have difficulties in primary relationship– continues to focus on fears concerning health and financial problems."  *Id.*

On March 19, 2002, Ms. Giles noted, "client appears the same as last time I saw him. Mood is euthymic (not manic or depressed)."  Tr. 271.  Ms. Giles noted Schmidt was having problems with his Crohn's disease and was very distressed over his financial situation.  Ms. Giles assessed Schmidt as "mood and affect, behavior stable."  *Id.*  Ms. Giles directed Schmidt to continue on his medications and return in six weeks or as needed.

On April 15, 2002, Ms. Giles noted Schmidt was low on medication.  Tr. 270.  Ms. Giles prescribed Schmidt more Neurontin, Zyprexa, and Serzone and directed Schmidt to return in four weeks.

On April 18, 2002, Mr. Lawyer met with Schmidt.  Tr. 269.  Schmidt reported being out of medication.  Tr. 268.  Mr. Lawyer arranged to get more medication for Schmidt from Ms. Giles.  Schmidt reported feeling despondent due to being denied SSI benefits.  Mr. Lawyer discussed the importance of establishing a PCP.  Schmidt responded he could not afford to go to a doctor.  Mr. Lawyer noted Schmidt needed medical attention and financial stability.  Mr. Lawyer directed Schmidt to check on indigent programs for health care.

On April 22, 2002, Schmidt called to cancel his therapy session with Mr. Lawyer due to "being ill and unable to leave his home." Tr. 268. Schmidt reported being sick due to symptoms of Crohn's disease.

On May 2, 2002, Schmidt met with Mr. Lawyer. Tr. 267. Mr. Lawyer noted he "discussed relationship issues, including the computer, chat rooms, pictures, etc." *Id.* Mr. Lawyer also discussed Schmidt taking responsibility and the stress experienced by ongoing symptoms of Crohn's disease. Mr. Lawyer gave Schmidt information on indigent programs in the area.

On June 6, 2002, Mr. Lawyer noted he had made telephone calls relating to Schmidt's medical and financial needs. Tr. 266. Mr. Lawyer noted he had called various agencies regarding assistance but none had funds at this time. Mr. Lawyer assessed Schmidt as "client needs medication for symptoms of Crones (sic) disease, etc. Needs to establish PCP/medical provider." *Id.*

On the same day, Mr. Lawyer met with Schmidt for an individual therapy session. Tr. 265. Mr. Lawyer noted Schmidt had received some of his medications from Ms. Giles, however, she was out of Zyprexa. Ms. Giles indicated she would notify Mr. Lawyer as soon as it arrived. Schmidt reported feeling very nauseous and chronically tired. Schmidt stated he had no money to get his medications for his Crohn's disease and was not able to see a doctor at First Choice because he had no money. Mr. Lawyer discussed other indigent programs in the area. Mr. Lawyer also discussed Schmidt's "ongoing difficulties with his roommate and their conflicts relating especially to finances." *Id.*

On June 20, 2002, Schmidt called Mr. Lawyer to discuss a situation with his roommate that upset him.  Tr. 264.  Schmidt reported his roommate was bringing his step-father from Oregon to live with them and expected Schmidt to take care of him during the day.  Schmidt stated he was worried, upset and angry about this because his roommate did not discuss it with him.  Mr. Lawyer scheduled a therapy session with Schmidt for the following day.

On July 1, 2002, Schmidt returned to see Mr. Lawyer for his therapy session.  Tr. 263.  Mr. Lawyer noted Schmidt had spent $40.00 on tongue piercing and a stud.  Schmidt discussed having trouble speaking with the stud.  Schmidt reported being out of his medications and having trouble sleeping.  Mr. Lawyer noted Schmidt had not seen Ms. Giles since June 5, 2002.  Mr. Lawyer set up a staffing meeting with Ms. Giles and Angela Garza to discuss Schmidt's situation.

Schmidt's psychiatric records support the ALJ's finding that "ongoing treatment controls [his bipolar] disorder."  Tr. 18.  Additionally, even if the ALJ considered Dr. Baca a "treating source," substantial evidence supports the ALJ's finding that Dr. Baca's opinion of disability was "inconsistent with the evidence."  *Id., see Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984)(If the opinion of the claimant's physician is to be disregarded, specific legitimate reasons for this action must be set forth.).  Accordingly, it was proper for the ALJ to disregard Dr. Baca's opinion of disability and adopt Dr. Gonzales' psychiatric evaluation.  The ALJ also considered Schmidt's activities of daily living in finding that his mental impairment was not disabling.  The record supports her finding that he was capable of "light meal preparation, social interaction with family and friends, driving a car, TV viewing and use of the internet for word games."  Tr. 17.  It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482,

1486 (10th Cir. 1994).  Substantial evidence supports the ALJ's finding that Schmidt's mental impairments were well controlled when he adhered to his medication regimen and, therefore, were not disabling.

## C.  Conclusion

The Court will remand this matter to allow the ALJ to consider the evidence before the Appeals Council.  As already noted, the Court expresses no opinion as to whether Schmidt is or is not disabled within the meaning of the Social Security Act.  The Court does not require any result.  This remand simply assures that the ALJ applies the correct legal standards in reaching a decision based on all the facts of the case.

A judgment in accordance with this Memorandum Opinion and Order will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**